No. 66.—CHARLES WALKER, executor, plaintiff in error, *vs.* WILLIAM HUNTER, *et al.* defendants.

[1.] If it is the rule of the Ecclesiastical Courts of England, that the evidence of as many as two witnesses is necessary to prove the execution of a will, be the circumstances what they may, it is not the rule of any of the Courts of this State.

[2.] Although a person has a right, and it is lawful for him to move a testator, to make him his executor or give his goods even, when the testator is a person of weak judgment and easy to be persuaded, and the legacy great; yet, if, in such a case, a person does so move a testator, a very strong presumption arises, that the " moving" is of a sort not right or lawful—a presumption only to be rebutted, by that person's bringing forward something sufficient to show the will such as a man of average mind, morals and family love, might be supposed willing to make.

[3.] Whilst a case is on trial, a Counsel for the party that prevails, entertains, for a night, two of the Jury and the prevailing party: *Held,* that this is a sufficient ground for a new trial.

[4.] If a paper, calculated to influence a Jury in favor of one of the parties, gets improperly before them while considering of their verdict, and they find for that party, it is a ground for a new trial.

Caveat, from Twiggs Superior Court. Tried before Judge POWERS, March Term, 1854.

This was a caveat to the last will and testament of William Hunter, Sr., filed by the defendants in error, on the following grounds:

1st. That the testator, William Hunter, at the time he made and published said will, was not of testable capacity, but was of weak and unsound mind.

2nd. That the said testator, at the time he made and published his said last will and testament, was laboring under a mental delusion in regard to the slaves or negroes bequeathed by him in said will; that he fancied, and delusively believed, that their being separated and scattered after his death, might be prevented by bequeathing them all to one person; and that under such mental delusion, he made and published his last will and testament.

3d. That the said testator was unduly and improperly influenced to make the said last will and testament, by the said Charles Walker, one of the executors thereof, and in favor of whose son, or sons, not being of the blood or akin to the said testator, an estate in remainder of all the negroes and their increase was bequeathed.

4th. That the said Charles Walker, the executor of the said last will and testament of the said Wm. Hunter, deceased, procured the said William Hunter by his fraud, covin, and by his wicked and fraudulent contrivances and machinations to make the said will and testament, and that the same is void—

For that the said Charles Walker, executor, as aforesaid, induced the said William Hunter to leave his residence in the County of Twiggs, and go (to) the residence of himself, or that of one of his brothers, in the County of Pulaski, where the said will was executed.

That the said will is headed, "Georgia, Twiggs County," where the residence of the said William Hunter was, and executed in the County of Pulaski, where the said Charles Walker resided.

That two of the witnesses to the last will and testament were the brothers of the said Charles Walker, one of the executors thereof, and uncles of one of the legatees in remainder, and the other an employee or workman employed at the time, by the said Charles, or one of his brothers.

That the said Charles Walker, executor aforesaid, procured the draft of said will to be made by an Attorney at Law—but by what Attorney at Law is unknown to this caveator—and to be copied off by some other person—but by whom is unknown to this caveator.

That said last will and testament was not drawn by the instructions of the said testator, but by the instructions of the said Charles Walker.

That by the said will, an estate in remainder, of all the negroes of the said William Hunter, deceased, was bequeathed to one of the sons of the said Charles Walker, and in the event of his death before the death of Charles Hunter, the person to

whom a life estate in the same negroes was bequeathed, then the said negroes were bequeathed to David Walker, another son of the said Charles Walker, executor.

That the said Charles Walker, nor his son or sons, are or were of blood kin to the said testator.

That the said William left several brothers and sisters, nieces and nephews, his heirs at law, having departed this life without leaving a widow or child, or descendant of child; that all were excluded from the provisions of the will, except Charles Hunter, although they were friendly and on good terms with the said testator; that to the said Charles Hunter the said William Hunter bequeathed and devised the whole of his estate, real and personal, except his negroes, and a life estate in them.

That the said Charles Hunter was a man of weak mind, easily controlled and much under the influence of the said Charles Walker, the executor as aforesaid, and actually, in a few months after the death of the said William Hunter, deceased, executed to the said Charles Walker, the said executor, a deed of gift of all his lands, acquired under and by virtue of said will : and also of all the stock and their increase, and his plantation tools— all of great value, to-wit: of the value of twenty thousand dollars, or other large sum; and subsequently executed a will, by which, in a state of great mental weakness and unsoundness, and while of intestable capacity, as this caveator believes and alleges, he bequeathed to the said Charles Walker, all his money and debts not previously conveyed to him in the deed of gift: that he made no return of an inventory or appraisement of the estate of the said William Hunter : that he alone as executor of said William Hunter, at first qualified as executor and took out letters testamentary.

The following is the bill of exceptions, which will show the facts of the case :

GEORGIA—TWIGGS COUNTY :

Be it remembered, that at the March Term, 1854, of Twiggs Superior Court, the above stated cause came on to be tried, on

appeal, before the Hon. A. P. POWERS, Judge, and a special Jury, when Counsel for propounder moved to strike out the second ground of caveat and so much of the fourth as brought in question the capacity of Charles Hunter, which motion was over-ruled by the Court, and propounder excepted.

## EVIDENCE.

David Walker was sworn, and testified that the paper handed him was the will of William Hunter. He, the witness, subscribed it as a witness the day it bears date, 16th Nov. 1839. Thomas D. Walker and Richard W. Lee subscribed the will at the same time as witnesses with him, the witness, and that this is the paper they witnessed. Thomas D. Walker is dead, and has been for eight or ten years. Does not know where Lee is. He is not in Georgia within witness' knowledge. He has inquired for him and cannot hear of him, and does not know where he is, nor which way he went. Has been gone six or seven years. He, witness, saw testator, William Hunter, sign the will in presence of the witnesses, and the witnesses signed it in the presence of the testator, Hunter, and of each other. Witness signed it at the request of William Hunter; signed the paper as his will, in the presence of the witnesses, and they all signed in presence of each other. William Hunter came to witness' house at front gate and asked him to go with him to Charles Walker's, and he went with him; and on the the way to Charles Walker's, Hunter told witness he was going down to make his will, and wanted him to witness it. Witness, David Walker, lives not over a half a mile from Charles Walker's, and between William Hunter's and Charles Walker's. Wm. Hunter lived about six miles above witness. The paper, the will shown witness, is the paper Hunter asked witness to sign. He saw Thomas D. Walker and Richard W. Lee sign it. Their signatures are genuine. As far as witness knew, William Hunter was of sound mind. He thought him, at the time, capable of transacting business. Had been acquainted with him fifteen or twenty years. When witness first became ac-

quainted with him he lived about ten miles from him. Afterwards moved to within six miles. Had had a good deal of intimacy with him. William Hunter came to witness' house on the day testified about, on horseback. He discovered no difference in his mind on that day (the day the will was executed) from what it was before. Appeared to be in good health, and was not sick. Hunter had a good deal of property, lands, negroes, horses and mules. He had a good many negroes, and managed all his own business. He lived several years after the date of the will, and is said to have died in his seventy-fourth year. William Hunter, after he got to Charles Walker's, observed to witness, "I want you all to sign it," (the will.) No one was with Hunter when he called at witness' house. He wanted witness to go with him and he went. He did not then say what he wanted. Thomas D. Walker lived about three quarters of a mile from Charles Walker's. Lee was there when witness and Hunter got there. Thomas D. Walker got there about the time witness got there. He lived below Charles Walker's. Dr. Taylor was there when witness got there. It was not half an hour after witness got there before the will was signed. The first he saw of the will Mr. Hunter had it in his hand, and he laid it on the table. No one had time to write the will after witness got there. Witness does not suppose the will is in the testator's hand-writing. Testator did not tell witness, as he went to Charles Walker's, whether he had the will written or not, nor did he show the will to witness. Charles Walker, Thomas D. Walker and witness, are brothers. William Hunter lived from three fourths to a mile from Taryersville, a public place. William Hunter invited witness from the parlor into the room where the will was executed. Charles Walker was in the room. He does not recollect that Hunter had been sick, and staying at Charles Walker's before the will was made. There was a report that testator once attempted to hang himself. It was, he thinks, some time before the date of the will; but never heard they had to set up with him and watch him to prevent his hanging himself. Nor does he recollect that testator had, about that

time, been at Charles Walker's.  Cannot say that Charles Walker had attended to business for testator.  Charles Walker might have shipped his cotton.  The testator did not have much company about his house, but was frequently at Tarversville.  He lived secluded and had but little to do with the world.  Witness did not know testator before he had much property.  Charles Walker visited testator in company and alone.  Does not know how often.  He and his family visited Hunter as relatives usually do.  Testator was a good farmer, and as far as witness knows, a man of strong mind, and very determined.  Witness does not know how long after the date of the will it was that Lee left.  Lee usually made Thomas D. Walker's his home while he was in the neighborhood.  The The will was not read in witness' presence.  The testator took it when signed, and witness next saw it in the Ordinary.  Witness does not know who produced the will before the Court of Ordinary, but supposes Charles Walker, the executor, when first produced for probate; nor does he know where it came from.  He believes testator had mind enough to remember the names of his negroes.  He heard it spoken of how the property was given, but never heard the will read to this day (the day of testifying).  Charles Walker's oldest son is seventeen or eighteen years old, now.  Witness don't remember how many children Charles Walker had at that time, but thinks three or four.  At the time the will was made, Charles Hunter had no property except a horse and some money.  Charles Hunter lived with William Hunter, (his brother,) and after his death he lived a short time at William Hunter's plantation, and then went to Charles Walker's, and died there. The mother of William Hunter lived and died at Thomas Hunter's (her son,) as Thomas Hunter told witness.  After Charles Hunter got to Charles Walker's, he, Walker, had a room built for him.  Charles Hunter rather opposed the building the room.

To all this testimony touching Charles Hunter and his property, and the sayings of Thomas Hunter, the Counsel of pro-

pounder objected, but their objections were over-ruled and they excepted.

The witness further testified—William Hunter was a widower. Charles Walker's first wife was the grand-daughter of William Hunter's dead wife. William Jemerson Walker is dead, and if alive would now be twenty or twenty-one years old. David Walker is the son of Charles Walker's first wife, and who was a Jemerson. Witness does not know from whom William Hunter derived his property. He does not know when Mrs. Hunter died. Charles Walker is now in possession of the lands devised by William Hunter to Charles Hunter.

This was objected to by Counsel for propounder, but admitted by the Court, and they excepted.

The will of William Hunter was then read in evidence, and which is, by copy, as follows:

GEORGIA, TWIGGS COUNTY:

Exercising the privilege which is conferred upon me by the laws of my country, of disposing of my property whilst in life, by a will to take effect upon my death, I do hereby declare this instrument as my last will and testament, as follows:

First. I desire that my just debts shall be paid.

Second. I give and bequeath unto my brother, Charles Hunter, for the natural love and affection I cherish for him, all my lands, money and stock of horses, cattle, hogs, and all other chattels, personal, whatsoever, subject to the exception hereinafter mentioned, and the remainder or limitation thereof.

Third. My negroes and their increase I give and bequeath to my brother Charles, during his natural life, or a life-time estate therein; and upon the death of my said brother, I then give and bequeath my negroes and their increase, absolutely, unto William Jemerson, first son of my friend Charles Walker of Pulaski County, for the friendship and good will I bear to said Charles and his son, William Jemerson. And should William Jemerson die before my brother, Charles Hunter, I then give and bequeath my negroes and their increase unto David, the second son of my friend, Charles Walker, absolutely.

Lastly. I appoint my brother, Charles Hunter, and my friend, Charles Walker, my executors, with ample authority and discretion to carry out the intention of my will.

Signed and sealed by the testator in our presence, and in the presence of each other, at the request of the testator, this the sixteenth of November, in the year of our Lord, One Thousand Eight Hundred and Thirty-nine.

WILLIAM HUNTER, [L. S.]

Test—

    DAVID WALKER,
    THOMAS D. WALKER,
    RICHARD W. LEE.

The propounder having closed, the caveator offered in evidence what purported to be a will of Charles Hunter, after proving by Lewis Solomon that it was the original, from his office of Ordinary, and was proven in common form by Charles Walker, the executor, who took out letters testamentary.

GEORGIA, TWIGGS COUNTY:

In the name of God, Amen. I, Charles Hunter, of said State and County, being of advanced age and knowing I must shortly depart from this world, deem it right and proper that I should make a disposition of the property with which a kind Providence has blessed me—I therefore make this my last will and testament.

1st. I desire and direct that my body be buried in a decent and Christianlike manner, by the side of my brother, William Hunter.

2d. I desire all my just debts be paid by my executor without delay.

3d. I give and devise to my much esteemed friend, Charles Walker, Sr. of Pulaski County, all money that I may have at my death, either in notes or bank checks, or whatever I may die possessed of, that I have not heretofore deeded away.

4th. I constitute and appoint my worthy friend, Charles

Walker, Sr. of Pulaski County, executor of this my last will and testament, this April 29th, 1851.

CHARLES HUNTER, [L. S.]

Signed, sealed, delivered and published by Charles Hunter as his last will and testament, in the presence of us, the subscribers, who subscribed our names hereto in the presence of said testator and of each other, this 29th April, 1851.

CHARLES E. TAYLOR,
WILLIAM MARTIN FRASER,
SETH S. MELLON.

Which will was objected to as incompetent and irrelevant evidence, by Counsel for propounder of Wm. Hunter's will, and objection over-ruled, and they excepted.

The caveators then offered in evidence a deed from Charles Hunter to Charles Walker, which propounder's Counsel objected to as incompetent and irrelevant, but objection over-ruled, and they excepted, and the deed was read as follows:

GEORGIA, TWIGGS COUNTY:

This Indenture witnesseth, that for and in consideration of the friendship and kind feeling which I bear for Charles Walker, of the County of Pulaski, and for the valuable consideration of the sum of one hundred dollars, in hand paid me, the receipt whereof is hereby acknowledged, I, Charles Hunter, of the State and county aforesaid, do bargain, sell, and convey unto said Walker, all that body or parcel of land amounting to twelve hundred acres, more or less, on which I now reside, adjoining Tarver's, Shine and others, and to his heirs, to have and to hold the same to their own proper use, benefit and behoof, forever. As also, I bargain, sell and convey unto Charles Walker, all my stock of every description, of horses, mules, cattle, hogs, &c. as also all plows, gear, tools, and every other article or thing belonging to the plantation, necessary to the proper cultivation or repair or keeping up of the same. This deed of conveyance to be subject to this condition: that the said Charles Hunter is to continue in the

Walker, ex'r, *vs.* Hunter *et al.*

unrestricted use, control and enjoyment of all the property herein conveyed, for and during his natural life, without rent or accountability for such use.   And should any of the personal property or chattels now and hereby conveyed, be exchanged for other property, that so exchanged for is to be treated and held as propeity now conveyed; and the increase of the stock of every kind, as also of other chattels, however caused, is to be treated and considered as a part of this conveyance, and secured to the said Charles Walker thereby.

In testimony whereof, I have hereto set my hand and seal, this 27th October, 1847.

CHARLES HUNTER, [L. S.]

In presence of
DANIEL H. COOMBS,
IVERSON L. HARRIS,
ISQUAL RAINEY, J. P.

Caveators then offered the depositions of Samuel Jemerson, to which Counsel for propounder objected as incompetent, so far as they related to the saying of Mrs. Hunter, and touching the report of a former will, and an agreement, verbal, between Hunter and his wife.   Objection over-ruled, and Counsel excepted.

Samuel Jemerson: Witness knew William Hunter, of Twiggs County, Georgia.   He married his mother, then Mrs. the widow Jemerson; but he knows nothing of any agreement between said Hunter and his said wife, prior to their marriage, respecting their property, or the division of the same.   He once had a conversation with his mother, then the wife of Hunter, in which she informed him that her husband had made a will, and had given one half of his property to his people and the other half to her people.   That some seven or eight years after the death of his mother, he communicated to Wm. Hunter what his mother had told him, and asked him if he had made such a will; and he answered that he had, but that since the death of his wife he had burnt it.   Said will was written,

as well as he now recollects, by Wm. Dowsing of Lincoln County. In the conversation with W. Hunter, above referred to, he asked him what objection he had to carrying out the agreement or understanding between him and witness' mother in relation to the disposition of their property as aforesaid; and said Hunter then replied, that it was terrifying to him to have his negroes scattered all over the world. Witness then asked him how he could prevent that after his death; and Hunter told him he thought he had fixed that; that he had given the negroes to Charles Walker's child, and that by the time that child would die, the negroes would die with old age. He once had a conversation with Charles Walker, and immediately after with William Hunter above stated, in regard to said Hunter, several years before having been deranged in his mind, and said Walker told witness that at the time said Hunter was so deranged in mind, he, Walker, went to Hunter's house and persuaded him to go home with him, which Hunter did; and that in about three days he cured him (Hunter). Witness then asked Walker how he did it; and Walker laughed and said he did it by talking to him. Walker further stated to witness, that while Hunter was so deranged in mind, Charles Hunter, brother of William Hunter, sat up and watched him (Wm. Hunter) three days and nights, to keep him from hanging himself. This conversation, above detailed, with William Hunter and Charles Walker, occurred in October or November, 1839. He is not interested in the case. William Hunter was married to his mother in the month of August, 1802, but does not know when the will was made, about which he and Hunter had the conversation before stated. He has stated all the conversation between him and William Hunter about fixing his property, and that conversation occurred in October or November, 1839, at the house of William Hunter, in Twiggs County, Georgia. No person was present except Hunter and witness, and the reason he gave for fixing his property so was, that it was terrifying to him to have his negroes scattered all over the world. Witness does not know that the will in dispute is the same that was alluded to. In the conversation

Walker, ex'r, vs. Hunter et al.

which he had with William Hunter, he endeavored to get him to carry out the agreement between him and witness' mother, as he understood it, and that he did that by the request of his mother. Mrs. Hunter was the widow of Jemerson before marriage. Charles Walker's first wife was her grand-daughter, and was Margaret Jemerson before she married Walker. She is now dead : but when she died he cannot state. He tried to get Charles Walker to influence William Hunter to carry out the agreement which witness' mother had informed him was existing between her and her husband ; but he refused to do it. He once wrote to Stark Hunter that William Hunter, his brother, was dead; that it was understood that he had given his negro property to Charles Walker's oldest son ; and that if he was in his place he would commence suit for it. He wrote to said Hunter on the 4th February, 1847 ; he cannot state when nor where the verbal agreement between William Hunter and his mother was made, and of which he has spoken. He last saw Hunter at his own house, in Twiggs County, Georgia, in October or November, 1839. Said Hunter was then, judging from his conversation, a man of ordinary capacity, and capable of attending to his business as men generally do. William Hunter, when he married his mother, had no proberty except an old white horse. He did not know that Hunter was going to marry until the day before it took plaee. There is no private agreement between him and the heirs of William Hunter, or their Attorneys in relation to this suit. He never wrote but two or three letters upon the subject, and they were to Stark Hunter, and perhaps one other letter to Seth Hunter. Sworn to and executed in Alabama.

The depositions of Humphrey Jefferson were offered and objected to as the sayings of Charles Walker, long before he was executor, and also, witness' understanding. Objection overruled and deposition read, and Counsel for propounder excepted.

Humphrey Jefferson : Witness knew William Hunter prior to his death, as far back as he can remember. He heard Walker say something tending to show his opinion of the in-

fluence one might acquire over the said Hunter. The last time he saw William Hunter was at his, Hunter's house, but does not recollect the time. Hunter's wife was witness' grand-mother, and he has always understood he got his property by her. Witness had a conversation with Charles Walker some three or four years before he (witness) removed from Georgia, and during the year witness lived with Hunter; but does not recollect the year nor place, nor whether any one was present or not. This gave rise to the conversation. Witness had determined to leave William Hunter, with whom he was living. He met Charles Walker, who accosted him thus: "I suppose you are going to quit old Billy?"—when witness replied in the affirmative. Walker said he was a fool—that he ought to stay with said Hunter and nurse him—that he could influence him to give him, witness, all his property. This is the substance of the conversation alluded to. He does not know what kind of influence. Witness does not know the state of Hunter's mind when he made his will. This is all he knows.

Sworn to and executed in Alabama.

The depositions of Artimetia Wheat were offered and objected to as hearsay from Mrs. Hunter and others, and about another will not in controversy, and because some of the cross questions were not answered, but reference was made to her answers to direct interrogatories for answers to the cross. Objection over-ruled, and Counsel for propounder excepted.

She knew William Hunter, and I knew of his making a will, written by William Dowsing, Sr. in which he willed his property to his wife during her life-time; and at her death, the property was to be divided—one half to go to her children and the other half to his relatives. This will was made in Lincoln County, Georgia. Does not know what has become of it. It was left in the hands of William Dowsing, Esq. Witness' mother made an effort, through Mr. Wheat, her son-in-law, soon after the death of Dowsing, to get possession of said will; but was informed, said will could not be found amongst Esquire Dowsing's papers. She never heard Charles Walker say anything about William Hunter's will. Witness knows, that on a

visit to William Hunter's, soon after the death of her mother, (Mrs. Hunter) the said Hunter appeared to have lost his mind to a considerable extent. She visited Twiggs County again in 1841, some ten years after the death of her mother, and called on the said William Hunter—that his mind appeared much impaired—so much so that he was incapable of doing business correctly; and that he was all the time more or less intoxicated. She was present when William Hunter made a will (the Dowsing will)—that said will was made between the years 1805 and 1808, in Lincoln County, Ga. and was witnessed and sealed, but does not recollect who witnessed it. Dowsing, Wm. Hunter's mother and witness were present. William Hunter willed one-half his property, after his wife's death, to her children, and the other half to his relatives. The will in dispute is not that will; witness' mother made an effort, through witness' husband, to get that will. Witness visited William Hunter again in 1841, in the fall, but understood, before she went, she had no chance to get any of his property. Witness is daughter of William Hunter's wife; and from her mother and the Family Bible, she learns she was born on the 29th day of April, 1791. Since Charles Walker's refusal to use his influence in carrying out William Hunter's first will, she does not esteem him so highly as before; and the death of his first wife has not changed her feelings towards him. She knows that William Hunter's mind was as good when he made his first will, as it has been since her acquaintance with him.

Sworn to and executed in Alabama.

The depositions of Artemetia J. Lyle were offered and objected to because it was hearsay, and because it was the sayings of Charles Walker, long before he was executor, and she answers the crosses by reference to her direct answers. Objections over-ruled, and Counsel excepted.

She knew William Hunter of Twiggs County; was informed he married Mrs. Margaret Jemerson. She heard remarks made by Charles Walker to Moses Wheat, in relation to Mr. William Hunter and the disposition of his property. Mr.

Walker remarked to Mr. Wheat, he would do wrong to move from Twiggs County; that Moses Wheat ought to stay by William Hunter and nurse him well, and secure his property; that it was a fortune ready made, and that it was in his power to secure it, and he ought to do it. To which Mr. Wheat replied: "Charles Walker, that is not my way of doing business." Charles Walker then remarked that he, Wheat, was interested in the disposition of the property, and had more influence over him than any one else, and when he moved away somebody would get it, and that he, Mr. Walker, has as much right to it as any one else, apart from the legal heirs, and he would, after the removal of Mr. Wheat, nurse the old man and get it if he could. Mr. Wheat then asked Walker if he would have property got in that way. To which Walker replied, I had as well have it as any one else, and my motto is, to keep all I have got and get all that I can. She believes Mr. Walker's motives for using these remarks to Mr Wheat was to convince him it was his duty, having the power, as he, Walker, believed, to influence Mr. Hunter to make as near an equal distribution of the property as he, Mr. Wheat, thought to be just, and thereby secure the property to the legal heirs. She does not believe that Mr. Walker once thought that Mr. Wheat would or ought to secure it to himself individually. But after he saw that the children of Mrs. Hunter, and the heirs of Mr. Hunter, neglected their interest, he then believed he had as good a right to secure the property to himself as any one else. She knows nothing of any previous will. She is not related to William Hunter. Mrs. Hunter was her grand-mother. Moses Wheat married the daughter of Mrs. Hunter, and witness is the daughter of Moses Wheat. The conversation (between Moses Wheat and Walker) occurred in the year 1827, at and in the house of William Hunter. Mrs. Hunter, Mrs. Wheat and Mrs. Walker were in the house at the time, but witness does not remember that either of them were in the room at the time the conversation occurred. The remarks were made, she presumes, by Mr. Walker, from the knowledge of Mr. Wheat's having sold his possessions in Twiggs, with the intention of leav-

ing the county.   She resides in Chambers County, Alabama.
Sworn to and executed in Alabama.

James Ware testified he was acquainted with testator from
1805 to his death.   He heard Charles Walker say William
Hunter attempted to hang himself.   A report had gone out of
Mr. Hunter's derangement.   Charles Walker said Mr. Hunter
had got in a deranged way, and he carried his carriage and
took him home with him.   Testator never was a man of strong
mind.   Witness saw him at Richland meeting-house in May,
1839.   He was standing off to himself, leaning against a tree,
and appeared sad, serious and melancholy.   He thought tes-
tator at that time of weak mind.   He and witness were family
connections.   He had but little to do with but few persons who
had influence over him.   Two or three persons were as many
as had influence over him at a time.   When Hunter first came
to Twiggs County, William Jemerson and Moses Wheat had
more influence over him than any one else.   They had much
influence over him.   After they removed from Twiggs the most
influential friends of the testator were H. H. Tarver and
Charles Walker.   Testator seemed to have great confidence
in Chas. Walker.   It might have been prejudice in witness,
but it appeared to him that Hunter's mind was in about the
same situation up to the time of his death.   The reason which
led witness to this conclusion was from a conversation held with
Hunter.   He called to borrow money—$400—of him.   He
said he would not let him have less than a thousand dollars;
witness was sent for the day the testator died, to go to his house.
When he got there Charles Walker, Mrs. Walker and Charles
Hunter were there.   Mr. Hunter's papers were examined that
night: he found no will; witness had a conversation with
Charles Hunter in Charles Walker's presence.   Charles Hunt-
er was in a bad condition; he was almost deaf.   Witness en-
deavored to get Charles Hunter to will part of his property to
his poor kin.   Charles Walker spoke and said, "You might as
well sing psalms to a dead horse—he is in no fix to do any-
thing."   Witness never saw him afterwards in any better con-
dition; witness was in Marion the day William Hunter's will

was proved.   Charles Walker qualified as executor, and witness asked him if Charles Hunter was not going to qualify too; he replied, you know as well as I do, Charles Hunter is not qualified to do any kind of business.   It was stated, in Walker's presence, that the number of Hunter's negroes was fifty; the negroes were very likely, and would average from between four and five hundred dollars a-piece; witness and the other persons named examined the notes and money, which, together, amounted to between thirty-two and thirty-three thousand dollars.   The cotton crop of the previous year, amounting to seventy or eighty bags, was then at the gin-house.   The plantation was valuable, and then worth eight or ten thousand dollars; witness has seen Charles Walker at William Hunter's a few times; he has heard William Hunter and his wife speak of Charles Walker's being there frequently; witness never knew of William Hunter ever before having made a will other than the one in controversy; witness testified before the Ordinary that it was in May, 1838, he saw Hunter at Richland; he has since ascertained he was mistaken—that it was May, 1839, by referring to the minutes of the Association; witness, at one time, borrowed of William Hunter one thousand dollars, but this was not the time he applied for the four hundred.   He remembers Tarver's note for a large amount was among the papers of Hunter; witness never tried to get Charles Hunter to be qualified; he advised the Court that Charles Hunter could be qualified at any future Court; his feelings were hurt with Charles Walker on account of his suing him on the note given for borrowed money.; he had a conversation with William Hunter about the will, in which he remonstrated against the will, and might have so stated, on oath, on the former trial, but he does not now distinctly remember.   Hunter then gave, as a reason that he made his will thus, because he could not bear to separate the negroes, as they all came from one family, and he wished them kept together.   William Hunter died in 1847. Charles Walker's first wife was the grand-daughter of William Hunter's wife.   William Jemerson Walker and David Walker are blood relatives of William Hunter's wife.   Hunter died

about the first of January, 1847.	Witness heard from family connexion that the property came by Mrs. Hunter, his wife, and understood some time before his death that Hunter had given remainder in the negroes to Charles Walker's son

Counsel for propounder objected to all Ware's testimony, which related to Charles Hunter and his affairs. Their objections were over-ruled and they excepted.

Iverson L. Harris, Esq.: Testified he never saw Wm. Hunter but once; he received a communication containing a request to prepare a will for Wm. Hunter. At this distance of time, cannot say whether it was from William Hunter or Chas. Walker. It was one or the other; he never had any business transactions with William Hunter; he drew the will pursuant to instructions, and enclosed it in a letter to Tarversville; he don't remembor to whom. There was one item in the will he drew, giving a small piece of land to Gen. Tarver. Afterwards, Tarver spoke to him about the will; when he saw Walker, he asked him if the will he had drawn and sent for William Hunter had been executed, and Walker informed him that it had; witness believes the preamble to the will propounded is in the language of the one he drew; it has the ear-marks; he cannot say Charles Walker did not send him the instructions. The letter inclosing the instructions was not in a similar hand to the signature of William Hunter to the will. The signature of the will appears like that of a paralytic man; was witness to the deed between Charles Hunter and Charles Walker, and explained to Hunter the difference between a deed and a will.

Objected to sayings about Charles Hunter and his deed. Over-ruled and excepted.

Seth Mellon testified: He was applied to to write Charles Hunter's will. Charles Walker handed him a Form Book and instructions for the will, in his, Walker's hand-writing; never had any conversation at all with Charles Hunter, about writing his will. Charles Walker does not now live in Georgia; removed in December, 1852. Charles Hunter died in September, 1851. His will was written April before. Mem-

orandum for will was furnished by Charles Walker, who requested the witness to write it in a plain, readable hand, so that Mr. Hunter could read it. Charles Hunter was staying at Charles Walker's at the time; Hunter read the will before he signed it. Walker got the witness to write it because he wrote a good hand; he was teaching school, and boarded at Walker's at the time; can't say the will was executed the same day he wrote it, but thinks it was not. Charles Hunter seemed to be reading the will; did not read it aloud; he expressed himself well satisfied with it. Charles E. Taylor, Dr. Fraser, Judge Hansell, and Hunter and Charles Walker went to Macon the next day; Hunter was in his usual health, except having a cancer. Charles Walker's family was exceedingly kind in taking care of and nursing Charles Hunter. Charles Hunter had been staying at Charles Walker's since the first of January, 1851. When Hunter signed the will, he said that was his wish and had long been. Witness never saw any efforts on the part of Walker, to induce Hunter to make a will; does not think he testified before the Ordinary, that Charles Hunter attempted to read the will; he did not read it aloud; did not know that Charles Hunter was dim of sight; he was deaf or hard of hearing; witness testified before the Ordinary, and now repeats, that in reading the will, Hunter could not make out one word, and called on witness to explain it, which he did. The word was about the middle of the page, but he could not, at that time, designate the word. Walker had a room built for Hunter. Charles Hunter was deaf.

Counsel for propounder objected to the whole of Mr. Mellon's testimony, as incompetent and irrelevant. Objection over-ruled, and they excepted.

Lewis Solomon, re-called: Swore that Signal Rainey was dead; that he testified before the Ordinary, that he was not qualified to judge of the legal capacity of William Hunter to make a will, but supposed he was capable; he was a man of ordinary grade of mind; he had contracted with witness to build him a house, and gave him a plan and paid him for it. This was, as well as he could remember, in 1839.

Rev. Henry Bunn: Testified he had known William Hunter a long time—twenty or twenty-five years. Their plantations. joined, and they were in the habit of exchanging neighborly civilities. Hunter transacted his ordinary business very well; he lived very much in solitude, and appeared not to have as much mind as he really had; he had but few confidential friends, and in those few he had the most implicit confidence; when he once had confidence it was very strong: witness never doubted that Wm. Hunter had mind enough to arrange his will just as he wanted it; he never doubted that Mr. Hunter had mind a plenty in 1839 and 1840, to make a proper disposition of his property; he did not know so much about him in 1840; his mind was of an ordinary cast; he once seemed to have wavered in his mind; he once talked of hanging himself; thinks it was some time prior to 1839—and witness believes, about the time his wife died; witness wanted to get some money of Mr. Hunter, but he did not seem as willing to let him have it as he expected; and afterwards, when witness told him he did not want it, Hunter seemed disappointed, and wanted him to take it that year and the next; he was not what is called a sharp man, but in buying goods he bought with care and bought low down.; he was a slow man, and slow to take up improvements; he was easily excited; a dry spell would excite him much; his mind once wavered; witness saw him about that time at General Tarver's. William Hunter's mind was between the two extremes of an idiot and a strong mind; as there are many grades of mind, it is hard to say what grade he had; he was always excited at a dry spell; he never would sell corn, when he had abundance, till a new crop was made; he had but few friends, and these had influence over him. William Jemerson and Moses Wheat had influence with him till they moved away, and then General Tarver had influence with him; he had confidence in Charles Walker, and thinks he had influence over him; witness had less acquaintance with William Hunter, for the seven years preceding the first of January, 1847, than before that time.

Theophilus D. Booth: Testified he knew William Hunter,

but was not particularly intimate with him. Has known him since witness was twelve years old, but never at his house but twice. Witness first knew Hunter when he was a school boy, boarding at William Jemerson's. After witness grew up, he and Hunter met frequently at Tarversville. The last time he saw him was in 1840 or 1845. Witness was riding by Hunter's field, where his hands were plowing near the fence. William Hunter was sitting on the fence. Witness said to him, you ought to have an overseer. Testator replied, I'll be rot if I can get a man that will do; witness replied, you have got no body to give your property to, but uncle Charley—alluding to his brother, Charles Hunter. He said, I have got somebody. I have made a will and given my negroes to Jemerson Walker. You have? said I; he replied, yes. Witness then said, what the hell and damnation did you do that for? You had better have given them to me or some poor person. Testator replied that Jemerson Walker was the son of his wife's favorite grand-child, and he did not want his negroes divided—he had never bought a negro, and he never wanted them divided—that Charles Walker's wife was the favorite grand-child of his, testator's wife, and all the negroes came from the Jemersons. Witness told Hunter he thought he once had a young man that suited him well; he replied, he thought so too; but that Humphrey had got so that he wanted him to do his way and he had to leave. Witness knew Mrs. Walker; he went to school with her. William Hunter said, on that day, that he loved Charles Walker's first wife more than any of the family of Jemersons. Witness resides in Pulaski County; did not see William Hunter very frequently. He lives about fifteen miles from Tarversville, but business called him there.

Thomas Glover: Testified he knew William Hunter, but not intimately. He thinks he had intellect enough to transact ordinary business. He did attend to and superintend his own plantation; witness has seen testator in the town of Marion, buying negro shoes; he had mind enough to make a will. Some two or three years before he died, testator told witness, going home from Marion, that he had more good will for

Charles Walker's first wife than every body else, and that on that account he had given his negroes to her son; and for the additional reason, that he did not want the negroes to be scattered; witness never was at William Hunter's house; he does not think Hunter was a man of strong mind; he has seen men of weaker and stronger mind; he does not know of testator's having any particular partiality; he said he could not bear the idea of having his negroes scattered; he had great friendship for Charles Walker.

Here the testimony closed on both sides, and Counsel for the propounder of the will asked the Court to give in charge to the Jury the following instructions, as the law of the case, and which are hereto appended, and numbered from 1 to 16.

But the Court refused to give in charge all the requests as made, but proceeded to charge the Jury as follows, and is hereto appended:

The Counsel for executor requested the Court to charge the Jury—

1st. That the execution of the will is sufficiently proved by an attesting witness, who swears that he saw the two other witnesses sign and subscribe the will produced, in his presence, and signed, and subscribed in the presence of the testator, and by his request, and in presence of each other, and that one of those subscribing witnesses is dead, and the other gone off out the State, and that after inquiry, he has not been heard of.

2d. That in the case of wills, where a witness has gone off from the neighborhood and abroad, and has never since been heard of, the signature and hand-writing of such subscribing witness may be proved by another attesting witness, as in case of a deed.

3d. That the Counsel for caveator, on appeal, having permitted, without objection, after the testimony given by David Walker, an attesting witness, the will to be read to the Jury as the will of William Hunter, cannot be permitted now, and to

the Jury, to make the objection that the paper is not sufficiently proved, and as required by their citation.

4th. That if, from the evidence, the Jury believe that Wm. Hunter had sufficient sense to transact the common business of life, he had capacity enough to make a will; and his being capricious in the disposition of his property will not invalidate his will.

5th. That a lower degree of intellect is requisite to make a will, than to make a contract.

6th. That if Wm. Hunter had, at the time of making his will, mind enough to know that he was giving property to his brother, Charles Hunter, and to Wm. Jemerson Walker, he had, in law, capacity enough to enable him to make a will.

7th. That the law does not measure the extent of the understanding of a testator. That unless, under the testimony, it appears to the Jury that William Hunter was totally deprived of reason, he had mental capacity enough to make this will; and as he is the lawful disposer of his property, his will stands as a reason for his actions.

8th. That a man's capacity may be perfect to make a will and yet very inadequate to the management of other business; as for instance, to make a contract for the purchase or sale of property.

9th. That a lower degree of intellect is necessary to make a will than to make a contract—that a mere glimmering of reason is sufficient.

10th. That it is not necessary, in order to establish a will, that the executor, or person claiming under the will, should prove that the will was read over to the testator, in the presence of the attesting or other witness.

11th. That the law presumes, in general, that the will was read by or to the testator.

12th. That David Walker and Thomas D. Walker, the brothers of the executor of the will, and attesting witnesses to the will, are competent and credible witnesses in law, and that by reason of their relationship to Charles Walker, the executor, no stain *necessarily* attaches to the testimony of such relations.

Walker, ex'r, *vs.* Hunter *et al.*

13th. That the opinion of witnesses as to the capacity of a testator, or in reference to any undue influence over him, are entitled to little or no regard, unless they are supported by good reasons, founded on the facts which warrant them in the opinion of the Jury.

14th. That fraud is never to be presumed. That when circumstances are relied on to establish its existence they should be so strong, when combined and examined, as to *satisfy* the Jury of the existence of the fact they are adduced to establish. That it will not do if they affect the judgment with nothing more than doubt and suspicion.

15th. That unless the Jury are satisfied from the testimony in the case, that it has been proved that Wm. Hunter made the will in controversy through constraint or fear ; or under compulsion or threat; without freedom of person or mind; or made it through *excessive* importunity, extorting from him, the said Wm. Hunter, what he was unwilling to grant or give, and which he had not firmness of mind or ability to withhold; no such *undue influence* is established, or can be established, by other means or modes of proof to authorize any Court or Jury to set aside the will of said Wm. Hunter, on *that ground.*

16th. That if the Jury believe from the testimony in the case, that Wm. Hunter had mind enough to make a will on the 16th November, 1839; that the will was formally executed by him and attested, as the law directs ; that he had volition, design, purpose, intention to dispose of his property by the will as he has done, they are bound to find in favor of the will; and that no tribunal can pronounce against it because of its disapprobation, *however strong,* of the dispositions made by the testator of his property.

The Court charged the Jury as follows :

The cause you are called on to try is on the last will and testament of William Hunter, deceased.   Charles Walker alleges that this paper is the will of William Hunter, and that he is the executor therein named ; and asks that you, by your verdict, should so declare it, and admit it to record.   The ca-

veators deny, in fact and in law, that it is the will of deceased, It is a right which the law gives to every individual of sound and disposing mind and memory, unless under legal disability, to dispose of his property, by last will and testament, in such manner and to whom he pleases, if he contravenes no rule of law in such disposition. It is immaterial how repugnant his disposition may be to our ideas of propriety and to the claims of blood, if he acts without restraint, and freely and voluntarily wills, being competent so to do, his act shall stand—he has only exercised his rights under the law. If, however, he is incompetent to make a will, from mental imbecility, or should execute one, influenced by fraud, duress or force, it will not, in law, be allowed to stand, because such an instrument would not, in fact, be the will of the pretended testator; it is not the free and voluntary act of his mind, but the will of another : not that of the alleged testator.

This paper was originally produced in the Court of Ordinary, and admitted to probate, in what is called common form, by Charles Walker, the person or one therein named as executor. This probate in common form is an *ex parte* proceeding, and is not conclusive; for in common form it is provable on the oath of the executor and one witness, without notice to the parties in interest. But after this, within a certain time limited by law, it is competent for the executor, himself, to proceed to its proof in solemn form, by an examination of witnesses before all those interested, to whom previous notice is to be given; or for any party in interest to call on the executor to bring in the will and prove it by an examination of the witnesses before all the parties, who have a right all to be present, to cross-examine the witnesses, and produce witnesses in opposition to the alleged will, all having any interest in the question, being previously notified of the proceedings.

In this case, the heirs at law of William Hunter have heretofore called on Mr. Walker to prove this will in solemn form before the Ordinary of this county—he has proceeded so to do. And, on hearing the proof in the cause, his Honor, the Ordinary of Twiggs County, passed an order and judgment in favor

of the validity of the will, and admitted the same to probate in solemn form; from which judgment of the Ordinary the heirs at law of William Hunter have appealed to this Court. That appeal brings the case before you for decision.

The question to be settled by you now is, whether this paper offered by Mr. Walker, shall be established by your verdict as the last will and testament of William Hunter, deceased. This you are to determine, irrespective of any thing which has heretofore been done judicially in the premises; but you are to determine this issue on the evidence before you, applying thereto such rules of law as shall be given you in charge by the Court.

The instructions prayed by the parties on either side are so full, and cover so fully all the points in the case, that I shall, in the charge, confine myself to these instructions—either to giving them as prayed for, refusing or qualifying them, as in my judgment may be right.

And the first point made is, as to the manner in which the execution of this paper, itself, has been proven before you. Only one of the subscribing witnesses, to-wit: Mr. David Walker, has been produced on the stand. The heirs at law call on the Court to charge, that it is " the duty of the executor called on to prove a will in solemn form, to produce the subscribing witnesses thereto, and prove the testable capacity and testamentary intentions of the testator."

Counsel for the propounder, Charles Walker, requests the Court to charge—

That the execution of the will is sufficiently proved by an attesting witness, who swears that he saw the two other witnesses sign and subscribe the will produced, in his presence, and signed and subscribed in the presence of the testator, and by his request and in the presence of each other, and that one of the subscribing witnesses is dead, and the other gone off out of the State, and that, after inquiry, he has not been heard of.

On the one side it is required that all the witnesses be produced, or proof of the execution fails. On the other, that one is sufficient; and on his testimony the Jury must set up the will. The heirs at law say but one witness has been produced

and sworn before the Jury ; there are three to the paper ; the law requires all shall be produced and sworn ; you must find against the will; the executor has failed even to prove its execution.   The propounder says : You must decree in favor of the will, because one subscribing witness has sworn before you that he saw the others sign ; they signed in the presence of the testator and each other, and at testator's request; one is dead, the other gone, and, after inquiry, cannot be found.

In my opinion, the law is not as contended for by either party, but that the true rule lies between them.   The very object of proving a will in solemn form, is to have a thorough investigation, because the decision predicated thereon is to be final and conclusive, as to the character of the paper.   It is therefore obviously the duty of the person setting it up, to produce all the evidence in his power or custody, which establishes its validity ; and his failure to do so would insure defeat.   An executor proposing, therefore, to prove a will in solemn form, would be compelled to produce all the subscribing witnesses, if in his power to do so.   But if it is impossible for him so to do, shall the will utterly fail and an intestacy be declared ?  I think not.  I am of the opinion that its execution may be proven on the testimony of one or more subscribing witnesses, and what, in law, is called the adminicular proofs.   But the impossibility of producing the others must be clearly and fully made, to the satisfaction of the Jury.   You are not necessarily bound to set up this paper as a will, on the testimony of David Walker alone, because you may not be satisfied with the proofs, in aid of his testimony offered by the executor.   The death of Thomas Walker, and his hand-writing, and the hand-writing of Lee, you may think, might also have been proven by other persons, and this would have been in aid of the testimony of the one subscribing witness,   Also, you may not be satisfied that the other witness, Lee, could not have been produced by the executor, after proper effort made.   If you should not be, then you would be at liberty to find against the execution of the instrument, in the opinion of the Court ; and therefore, the Court declines to charge you as requested ; and in the lan-

guage as requested, of the Counsel for Charles Walker.    But on the other hand, if you are fully satisfied, from the evidence before you, that Thomas Walker, one of the subscribing witnesses to this paper, is dead; that Lee, the other, is out of the jurisdiction of the Court, and that it is not in the power of Walker to have produced him, and that he has made all reasonable efforts so to do ; furthermore, that it has been proven by other witnesses, that the deceased intended to make a will such as this, before it was made ; and that afterwards, he had made such a one, (this-species of proof being adminicular, as I understand the term).    And furthermore, from all the facts in evidence before you, you be satisfied that the testimony of David Walker is supported, aided and corroborated, you will be justified in finding, by your verdict, the execution, *itself, of the paper, as a will,* has been sufficiently proven ; and therefore, I refuse to charge in the language as requested by the heirs at law of the deceased.    This point seems not to have been anticipated until the trial.    Little or no direct authority has been produced.    The Court has therefore charged the Jury according to the best of its impressions, but with some doubt.

As to the latter part of the request of the heirs at law, that the testator's capacity and testamentary intentions must be proved by the executor, the Jury are charged, that this duty does devolve on the executor ; and on his failure to make this proof, he is defeated.    As to what constitutes testable capacity, it will be explained hereafter ; and as to testamentary intentions, his design to make *a will* must appear at the time he executed the paper purporting to be his will.    The evidence, on this point, is before you for your consideration.

Again, the heirs at law request the Court to charge—

"That a person has no right, and it is unlawful for him, to move a testator to make him his executor or give his goods; when the testator is a person of weak judgment and easy to be persuaded, and the legacy great."

I am satisfied that this is a correct rule of law, and give it to you in charge as requested.    If you believe, from the evidence, that the deceased was a person of weak judgment, and easily to

be persuaded, and that Walker moved him to make him, Walker, his executor, and that the legacy to him or his children was great, the Jury are at liberty to set aside the will. It must be the free and voluntary act of the mind of the testator, which it is very obvious it could not be, if the pretended testator, under disabilities such as these, was moved and incited by another to will in his favor.

Again, they request me to charge—

"That when the testator is circumvented by fraud, the testament is void and of no force."

The Court most cheerfully gives you this rule in charge, to the full extent of the request. If you are of opinion, from the evidence, that the alleged testator in this case was circumvented by fraud, it makes no difference who was the actor in the fraud, it vitiates the whole will: it cannot be established as the will of the deceased, if it is the fruit of fraud practiced on him.

And again—

"That fraud in obtaining a will, like fraud in other cases, though not to be presumed, may be proved by circumstances."

This also is undoubtedly a sound rule of law. It is oftentimes impossible to prove the existence of fraud positively: "it lurks in the dark," as it is sometimes said, but a well connected chain of circumstances may establish beyond doubt its identity—its existence. If the Jury are satisfied, from the circumstances in evidence before them, that fraud has been perpetrated on the deceased, to induce him to make this instrument as his will, they may act on convictions thus derived, though they have no positive proof of the fact. And to enable you to determine for yourselves this question, all the facts connected with this transaction are before you.

Again, they request me to charge you—

"That in cases of undue influence and imposition, confirmation of the act does not remove the imputation."

I am not prepared to go the whole length of this request. It needs some qualification, in my opinion. The confirmation of an act, done undue influence and imposition, of course is a nullity, if the influence and imposition exist at the time of

Walker, ex'r, vs. Hunter et al.

the confirmation; and perhaps a presumption in favor of its existence, at that time, is raised. But if it be shown, that an act done under undue influence and imposition, afterwards, and when entirely removed from all undue influence, and aware of the former imposition, the actor confirms his previous act, his confirmation does remove the imputation. But if the evidence establishes undue influence and imposition, and nothing but the simple act of confirmation, without showing under what circumstances the act of confirmation was made, such confirmation does not remove the imputation, because the influence is supposed to remain. Therefore, if the Jury should think, from the evidence, that William Hunter executed this paper as his will, under undue influence and imposition, and the evidence should also show that afterwards he confirmed the act, such evidence of confirmation shall not remove the imputation. But if the evidence shows that the confirmation was free from influence or imposition, with a full knowledge of his position and his rights, such an act would give vitality to his former act, and remove all imputation.

Again, on the other side, Counsel for Charles Walker requests the Court to charge—

That in the case of wills, where a witness has gone off from the neighborhood and abroad, and has never since been heard of, the signature and hand-writing of such subscribing witness may be proved by another attesting witness, as in case of a deed.

The Jury have doubtless understood, from what I have already said, that I do not regard this proof as sufficient, without the aid of the adminicular proofs or circumstances. If this proof stands alone, in the opinion of the Jury, then the execution of the will, in the Court's opinion, is not sufficiently proven; but supported (if the Jury think it is) by other facts and circumstances, it may be sufficient to admit the will to probate. The Court cannot but remark, that this method of proving the signature and hand-writing of the absent witness is objectionable —does not strengthen the witness sworn—and the neglect to

prove by others the hand-writing of the absent witness, is an adminicular circumstance in proof against the execution of the will.

Again they request me to charge—

"That the Counsel for caveator on appeal, having permitted, without objection, after the testimony given by David Walker, an attesting witness, the will to be read to the Jury as the will of William Hunter, cannot be permitted now, and to the Jury, to make the objection, that the paper is not sufficiently proved, and as required by their citation."

I decline to give this request in charge to the Jury. The contrary thereof is the law, in the opinion of the Court. The execution of the will is one of the material facts the executor is called on to prove in solemn form before this Jury; and it is for the Jury to say now, by their verdict, whether he has done so agreeably to the requirements of the law. Its proper execution is a mixed question of law and fact, and the proof has been submitted and the issue thereon formed. The Court has given to the Jury its instructions on the law arising under this head, and it is the province of the Jury to apply the facts in evidence to these rules of law; and as they may determine, so to find.

Again, they request—

"That if, from the evidence, the Jury believe that Wm. Hunter had sufficient sense to transact the common business of life, he had capacity enough to make a will; and his being capricious in the disposition of his property, will not invalidate his will.

"That a lower degree of intellect is requisite to make a will than to make a contract.

"That if Wm. Hunter had, at the time of making his will, mind enough to know that he was giving property to his brother, Charles Hunter and to Mr. Jemerson Walker, he had, in law, capacity enough to enable him to make a will.

"That the law does not measure the extent of the understanding of a testator. That unless, under the testimony, it appear to the Jury that Wm. Hunter was totally deprived of

reason, he had mental capacity enough to make this will; and as he is the lawful disposer of his property, his will stands as a reason for his actions.

"That a man's capacity may be perfect to make a will, and yet, very inadequate to the management of other business; as for instance, to make a contract for the purchase or sale of property.

"That a lower degree of intellect is necessary to make a will than to make a contract; that a mere glimmering of reason is sufficient."

These, gentlemen, in the opinion of the Court, are established rules of law in reference to testable capacity. Indeed, it is believed that the Counsel has copied these requests *verbatim*, from opinions delivered by our Supreme Court, in cases in which the question of capacity was raised. They are therefore absolutely binding on this Court and Jury. But the Counsel for the heirs at law, has notified you and the Court also, that they do not contend that the deceased had not mental capacity sufficient to make a will; they rest their opposition on the ground of undue influence and imposition, he being a person of weak mind and judgment.

I have already informed you, that the capricious manner in which a testator may dispose of his property, does not invalidate his will, if he is otherwise competent to will. Under the law, he has the right to make his own will; and it shall stand, although not in conformity to our notions of propriety, justice, or the claims of kindred.

Again, they request me to charge—

"That it is not necessary, in order to establish a will, that the executor or person claiming under the will, should prove that the will was read over to the testator, in the presence of the attesting or other witness.

"That the law presumes, in general, that the will was read by or to the testator."

You are instructed, gentlemen, that this request embodies the correct rule of law on this subject. The testator is presumed to have read the will; and therefore, it is not necessary

that it should be proven to have been read over to testator in presence of the witnesses.

Again, they request the Court to charge—

"That David Walker and Thomas D. Walker, the brothers of the executor of the will, and attesting witnesses to the will, are competent and credible witnesses, in law; and that by reason of their relationship to Charles Walker, the executor, no stain *necessarily* attaches to the testimony of such relations."

The Court is of opinion that they are certainly competent witnesses, and that their relationship to Charles Walker, the executor, the party to the suit, does not necessarily stain their testimony. It is, however, for the Jury to determine what degree of weight and credit they think due to the testimony of the witness or witnesses; and the fact of relationship by the witness to the party, ought to be considered by the Jury, in arriving at a conclusion or estimate of the credit due to the witness, together with every other circumstance or fact in evidence before them, bearing on the question of credibility.

Again, the Court is requested to charge—

"That the opinion of witnesses, as to the capacity of a testator, or in reference to any undue influence over him, are entitled to little or no regard, unless they are supported by good reasons, founded on the facts which warrant them in the opinion of the Jury."

In the opinion of the Court, this is a reasonable and sound rule. The opinion of a witness, merely as an opinion, is worth but little—perhaps wholly incompetent testimony; but when accompained with all the facts and reasons on which that opinion is predicated, the Jury entertain not the opinion itself, but the fact, in order to see whether they arrive at the same or a different conclusion, agreeable to the legitimate effects thereof.

Again, the Court is requested to charge—

"That fraud is never to be presumed; that when circumstances are relied on to establish its existence, they should be so strong, when combined and examined, as to *satisfy* the Jury of the existence of the fact they are adduced to establish.

That it will not do if they affect the judgment with nothing more than doubt and suspicion."

The Jury are instructed in favor of this request, in its full extent, as prayed for. If the circumstances create in the minds of the Jury only a doubt or suspicion of fraud, they are not to presume fraud. They must be satisfied in their minds of the existence of the fraud, from all the circumstances in evidence before them.

Again, it is requested that the Court charge—

"That unless the Jury are satisfied from the testimony in the case, that it has been proven that Wm. Hunter made the will in controversy through constraint or fear; or under compulsion or threat; without freedom of person or mind; or made it through *excessive* importunity, extorting from him, the said Wm. Hunter, what he was unwilling to grant or give, and which he had not firmness of mind or ability to withhold. No such *undue influence* is established, or can be established, by other means or modes of proof to authorize any Court or Jury to set aside the will of said Wm. Hunter on *that ground.*"

Again, and lastly, the Court is required to charge—

"That if the Jury believe, from the testimony in the case, that Wm. Hunter had mind enough to make a will on the 16th November, 1839; that the will was formally executed by him and attested as the law directs; that he had volition, design, purpose, intention to dispose of his property by the will as he has done, they are bound to find in favor of the will; and that no tribunal can pronounce against it because of its disapprobation, *however strong*, of the dispositions made by the testator of his property."

You therefore see that it will be your duty, on this trial and investigation, to determine—

1st. Whether, from the evidence, and the law applied thereto as given you in charge, this paper has been properly and legally executed. If on this point you are satisfied with the testimony, then you will see whether the testator, at the time the will was made, was of sound, disposing mind and memory, as shall appear to you from the evidence and the law, as given

you in charge on this branch of the inquiry. You will then ascertain, also, from the evidence, whether the testator executed the alleged will, freely and voluntarily; whether it was the act of his own mind to make this will; to make it as it appears here before you; and whether he did so execute it, free from all illegal and improper control or restraint over him, as defined by the rules of law laid down for your guidance under this head of inquiry. And as you believe from the evidence, so declare by your verdict.

The Jury retired and found in favor of the will, declaring it the last will and testament of William Hunter, duly proved, and entitled to record.

When the Counsel for the caveator then and there, during the said March Term, 1854, of the Twiggs Superior Court, moved for a new trial in said cause, upon the following grounds, to wit:

1st. That the Court erred in deciding that respondent's Counsel had the right, in law, to open and conclude the argument before the Jury in said cause.

2d. Because the said respondent failed to prove in solemn form the paper proven in common form, to be the will of William Hunter, deceased, the testator.

3d. Because the said paper was not proven to be the will of the said William Hunter, deceased.

4th. Because the verdict of the Jury was contrary to evidence and the weight of evidence.

5th. Because the verdict of the Jury was contrary to the charge of the Court.

6th. Because the verdict of the Jury was contrary to law.

7th. Because the Court erred in its charge.

8th. Because, while the cause was pending before the Special Jury, E. E. Crocker, one of the Counsel for the respondent, on the night of the 23d March inst. entertained at his house two of the special Jury to whom the said cause was submitted for trial, and the respondent, Charles Walker.

9th. Because a paper was found in the room of the Special Ju-

ry, by the Jury, to which said Jury retired to make up their verdict, of which the following is a copy, which was calculated to misdirect the Jury as to the true issue before them, to-wit:

" The burden of the effort made by *Colquitt* before the Jury, is to show fraud on the part of Walker in Charles Hunter's will, which is not the issue before the Jury.   Nothing relating to Charles Hunter's will ought to be allowed, but the issue— was William Hunter capable, in law, to make a will.   The Jury will in *particular* act upon the evidence in the case, and the law given them in charge.   I fear the erroneous impression is now made in the mind of two or more of the Jury."

The Court, after hearing argument on the above motion, and considering the same, and being of opinion that respondent's Counsel had the right, in law, to open and conclude the argument before the Jury in said cause, over-ruled the first ground taken in the motion for a new trial, and refused to grant a new trial on that ground.

But the Court being of opinion that the said Charles Walker, the executor and respondent, failed to prove the will of the said William Hunter, the said testator, in solemn form, being the paper proven in common form, to be the will of the said William Hunter, the said testator, and being of the opinion that the execution of said will was not sufficiently proven ; and the Court being further of opinion, that the verdict of the Jury in said cause was contrary to evidence and the weight of evidence, and was contrary to the charge of the Court, and contrary to law ; and the Court being further of opinion, that the fact, that while the cause was pending before the Special Jury, E. E. Crocker, Esq. one of the Counsel for respondent, on the night of the twenty-third March, entertained at his house two of the Special Jury to whom the said cause was submitted, and the respondent, Charles Walker, was illegal and inadmissible in law ; and the Court being also of opinion, that the paper in the hand-writing of Lewis Solomon, and found by the Jury in their room, was calculated to mislead the Jury and in-

fluence their finding; it was therefore ordered and adjudged by the Court, that for the said reasons, the verdict of the Jury in said cause be set aside, and a new trial be awarded and had in said cause.

The errors assigned were—

1st. That the Court erred in permitting David Walker to testify about Charles Hunter and his property.

2d. The Court erred in admitting in evidence Charles Hunter's will.

3d. It erred in admitting in evidence the deed from Charles Hunter to Charles Walker.

4th. It erred in admitting the testimony of Samuel Jemerson about a former will of William Hunter, and the sayings of his mother.

5th. It erred in admitting the testimony of Humphrey Jemerson about the sayings of Charles Walker, long before he was executor or the will was made.

6th. He erred in admitting in evidence the testimony of Mrs. Wheat about a former will, and as to what her mother told her.

7th. He erred in admitting in evidence Mrs. Lyle's testimony as to her hearing others say, and as to the sayings of Charles Walker before he was executor, or before the will was made.

8th. He erred in admitting James Ware to testify as to the capacity of Charles Hunter, and about his property.

9th. He erred in admitting the testimony of Mrs. Harris about a deed made by Charles Hunter.

10th. He erred in admitting all or any of Mr. Mellon's testimony.

11th. He erred in over-ruling the motion to strike out the second and fourth grounds in the caveat.

12th. The Court erred in sustaining the motion for a new trial.

13th. The Court erred in granting a new trial in said cause upon any or either of the grounds sustained by the Court.

Walker, ex'r, *vs.* Hunter *et al.*

S. T. Bailey; I. L. Harris; Miller & Hall, for plaintiff in error.

Scarborough; McDonald, for defendants in error.

*By the Court.*—Benning, J. delivering the opinion.

Was it right to grant the new trial? That is the sole question in this case.

The Court below put its decision granting a new trial, on a number of grounds, viz: That the paper propounded as the will of Hunter had not been proven, in solemn form, to be his will.

That the execution of that paper had not been sufficiently proven.

That the verdict of the Jury was contrary to the evidence and the weight of the evidence—contrary to the charge of the Court and contrary to law.

That one of the Counsel for Walker entertained at his house one night during the trial, Walker and two of the Jury.

That the paper in the hand-writing of Solomon, found by the Jury in their room, was calculated to mislead the Jury.

If any one or more of these grounds were good, whether the others were good or not, the new trial was properly granted, and the judgment granting it ought to be affirmed. This Court might, therefore, content itself with pointing out such of the grounds as it considers good, if such there are, and go no further; but as the decision of the Court below was placed on all the grounds, it will not be improper, and probably will be best, for obvious reasons, even in case of an affirmance, that this Court shall consider all the grounds, though it may think some only of them good. That, therefore, will be done. In doing it, however, the grounds will be taken up in a different order from that in which they have just been stated.

Was the verdict contrary to the evidence, or to the weight of the evidence ?    This is the ground I shall begin with.

As to this ground, the Counsel for the plaintiff in error say, first, that the verdict was *not* contrary to the evidence or to the weight of the evidence ; and secondly, that if the verdict was contrary to either, it was so only because a part of the evidence was illegal evidence, namely : so much as related to Charles Hunter—to his deed, to his will and to his property— so much as related to a former will of Wm. Hunter, and to the sayings of his wife, and so much as related to the sayings of Charles Walker and others, before he, Walker, became executor, or before the trial had been made.

The latter of these replies will be noticed first.    Is it true that this part of the evidence was illegal evidence ?

The reason given by these Counsel for saying that the evidence relating to Charles Hunter, to his property, to his will and to his deed, was illegal, was, that it was irrelevant; that it could have nothing to do with an issue concerning a paper propounded as the will of another man, Wm. Hunter.

What, then, was the issue and what the nature of the evidence in question?

The caveator, among other things, alleged, in substance, that Charles Walker, with the design of acquiring for himself or a son, or both, the property of Wm. Hunter, a person not akin to either him or his son, by the use of undue influence and fraudulent contrivances, induced William Hunter to make the propounded paper as his will ; that though, by that paper, a portion of Wm. Hunter's property was given to Charles Hunter ; yet, that Charles Hunter was a person of great weakness of mind, and one entirely under the influence of Charles Walker, and that the giving of a portion of the property to Charles Hunter, was, in effect, the same as giving that portion directly to Charles Walker, as was proved by the result, which was, that Charles Hunter, after the death of Wm. Hunter, partly by deed and partly by will, gave all of the portion of the property given him by Wm. Hunter's will to Charles Walker.    This, in substance, is alleged by the caveator.

Now so much of this allegation as refers to Charles Hunter, his property, his deed and his will, the evidence objected to about him, his property, his deed and his will, tends to prove. This becomes apparent by merely reading that evidence.

The position, therefore, that that evidence was illegal, because irrelevant, is not well founded.

The only reason assigned in argument, by the Counsel for the propounder of the paper, to show the evidence of Mrs. Wheat and Samuel Jemerson, giving the sayings of their mother, spoken after her marriage with Wm. Hunter, in relation to a former will made by Wm. Hunter, to have been illegal, was, that the evidence was hearsay—was only of the sayings of Mrs. Hunter.

But as to Mrs. Wheat, it is not apparent that this reason is true, in point of fact. It is true, Mrs. Wheat swore this: " Witness' mother made an effort through Mr. Wheat, her son-in-law, soon after the death of Dowsing, to get possession of said will, but was informed said will could not be found amongst Esquire Dowsing's papers." But that this contains any thing that is hearsay, is far from clear.

And as to the evidence of Jemerson, he does, indeed, say this: " He once had a conversation with his mother, then the wife of Hunter, in which she informed him that her husband had made a will, and had given one half of his property to his people, and the other half to her people." But then he immediately adds this: " That some seven or eight years after the death of his mother, he communicated to Wm. Hunter what his mother had told him, and asked him if he had made such a will? and he answered, that he had, but that since the death of his wife he had burnt it." And this addition makes what had been the sayings of the witness' mother, become, in effect, the sayings of Hunter. And any sayings of his were legal evidence.

The reason, then, assigned by the Counsel for the propounder, to show this evidence to have been illegal, is not sufficient.

The sayings of Chas. Walker, which it was argued were illegal evidence, were those proved by Mrs. Lyle, and one

proved by Humphrey Jemerson. And the objection to these sayings was, that they happened before the making of the paper propounded as Hunter's will; and therefore, before Chas. Walker could have been executor of that will; and so, that the sayings, when made, were such as could neither be against the interest of Walker, or as could bind those claiming under the paper propounded as the will of Hunter.

This objection to the evidence of both of these witnesses, as matter of fact, exists. And as to the evidence of one of them, Humphrey Jemerson, it is sufficient, as matter of law. But it is not so sufficient as to the evidence of the other, Mrs. Lyle, for her evidence is admissible on another ground. The sayings of Chas. Walker, to which she testifies, make part of the *transaction* as much a part of it as does the fact that the paper was executed at Chas. Walker's house make part of it. Those sayings are: "that he, Wheat, was interested in the disposition of the property, and had more influence over him than any one else; and when he moved away somebody would get it, and that he, Mr. Walker, has as much right to it as any one else, apart from the legal heirs, and he would, after the removal of Mr. Wheat, nurse the old man and get it if he could."

But as to the sayings testified to by Humphrey Jemerson, they manifestly make no part of the transaction—of any transaction in which Walker took part. They are merely to the effect, that the witness, that Humphrey Jemerson, not Walker, could influence Hunter to give him, Jemerson, all his property.

They were not admissible, therefore, as a part of the *res gestæ*. And that being so, having been made before Walker became executor, they were not admissible at all.

It is, as to this evidence, then, of Jemerson, and this only, that the Counsel for the plaintiff in error are right in saying, that a part of the evidence in the case was illegal.

But this is a very small part of the whole evidence—too small a part to warrant this Court in believing that the verdict turned upon it.

It remains to say, that in the opinion of this Court, the

Counsel for the plaintiff in error do not establish their position, viz : that if the verdict was contrary to the evidence, or the weight of evidence, it was so because a part of the evidence was illegal.

As to their other position on this point—the position, that the verdict was not contrary to the evidence or to the weight of the evidence, supposing the evidence to have been all legal, we express no opinion. That we should express one is not necessary, as on other grounds, we shall affirm the judgment granting the new trial; and as it is to be presumed that the new Jury, should this same evidence come before them, will, of themselves, rate it at its proper value.

The next of the grounds on which the Court put its judgment—granting the new trial, which will be noticed is, the ground, that the verdict was contrary to the *charge* of the Court.

In respect to this ground, the Counsel for the plaintiff made a reply, somewhat similar to that which, as we have seen, they made in respect to the ground just considered. They said that a part of the charge was law and a part not law, and that though the verdict might perhaps be contrary to the latter part, it was not contrary to the former; and so, that the verdict, even if contrary to such latter part, ought not to be disturbed.

Of the part of the charge which they insisted was not law, the following is a portion : "An executor proposing, therefore, to prove a will in solemn form, would be compelled to produce all the subscribing witnesses, if in his power to do so. But if it is impossible for him so to do, shall the will utterly fail, and an intestacy be declared ? I think not. I am of opinion that its execution may be proven on the testimony of one or more subscribing witnesses, and what, in law, is called the adminicular proofs. But the impossibility of producing the others must be clearly and fully made, to the satisfaction of the Jury. You are not necessarily bound to set up this paper as a will, on the testimony of David Walker alone, because you may not be satisfied with the proofs in aid of his testimony offered by

the executor.    The death of Thomas Walker, and his hand-writing, and the hand-writing of Lee, you may think, might also have been proven by other persons; and this would have been in aid of the testimony of the one subscribing witness.    Also, you may not be satisfied that the other witness, Lee, could not have been produced by the executor after proper effort made. If you should not be, then you would be at liberty to find against the execution of the instrument, in the opinion of the Court; and therefore, the Court declines to charge you as requested, and in the language as requested by the Counsel of Chas. Walker.    But on the other hand, if you are fully satisfied, from the evidence before you, that Thomas Walker, one of the subscribing witnesses to this paper, is dead; that Lee, the other, is out of the jurisdiction of the Court, and that it is not in the power of Walker to have produced him, and that he made all reasonable efforts so to do; furthermore, that it has been proven by other witnesses, that the deceased intended to make a will such as this, before it was made, and that afterwards he made such a one (this species of proof being adminicular, as I understand the term): and furthermore, from all the facts in evidence before you, you be satisfied that the testimony of David Walker is supported, aided and corroborated, you will be justified in finding, by your verdict, the execution, *itself, of the paper*, as a *will*, has been sufficiently proven; and therefore, I refuse to charge in the language as requested by the heirs at law of the deceased."

This portion of the charge the Court gave instead of one which the Court was requested by the plaintiff to give, and of one which it was requested by the defendant to give.    That which it was requested by the defendant to give, was as follows: " that it is the duty of the executor called on to prove a will in solemn form, to produce the subscribing witnesses thereto, and prove the testable capacity and testamentary intentions of the testator."

That which the Court was requested by the plaintiff to give, was as follows: " That the execution of the will is sufficiently proved by an attesting witness, who swears that he saw the two

other witnesses sign and subscribe the will produced, in his presence, and signed and subscribed in the presence of the testator, and by his request, and in presence of each other, and that one of the subscribing witnesses is dead, and the other gone ·off out of the State, and that after inquiry he has not been .heard of."

Considering what the Court charged and what it refused to ·charge, we think the Court meant to declare this to be the law, ·viz: that in no case is the evidence of one witness sufficient to prove the execution of a will, in a proceeding to establish the will in solemn form; that in every case the evidence of at least two witnesses is necessary, of which evidence, however, if that of one of the two goes to the main fact, the signing and publishing, that of the other need go no further than to some adminicular facts.    We suppose, indeed, that the Court intended to tell the Jury, that in a proceeding to establish a will in solemn form, the law which governs as to evidence, is the general law of the Ecclesiastical Courts, according to which one witness does not make full proof.    (1 *Wms. Ex'rs*, 214.)

If we are right in this, the questions are, first, what is the number of witnesses which the law of the Ecclesiastical Courts require in such a proceeding.    Secondly, will other Courts, when such a proceeding is taking place before them, observe that law, whatever it is, in preference to the law which they use in proceedings peculiar to themselves?

If we make decided cases the criterion, we cannot, with certainty, say that it is the law of the Ecclesiastical Courts, that they shall require more witnesses than one to the execution of a will.    In the case of *McKenzie vs. Yeo*, (7 *Eccl. Rep.* 403) a case which, in the opinion of the Court deciding it, depended upon the evidence of but a single witness, the Court, it is true, refused to consider the will proved—but the Court, according to my understanding of what it says, puts its decision not on the ground that the evidence was the evidence of only one witness, but on the ground that the evidence was, in itself, not credible, all the facts of the case considered.    My inference from what is said in that case is, that if there had been no coun-

tervailing facts in the case, the evidence of the one witness would have been held sufficient to prove the will.

And in the case of *Moore vs. Payne,* (2 *Lee Eccl. Rep.*) Sir *George Lee* said that the proof of a will is by the *jus gentium,* and that by that law, one witness is sufficient—adding, however, that in the case of only one witness, there should be some adminicular proof to corroborate him. But does the *jus gentium,* I ask, recognize this doctrine of the necessity of adminicular proof, when there is but one witness?

Then it is beyond question the law that the Ecclesiastical Courts dare not, on pain of a prohibition, require more witnesses than one to the payment of a legacy, to the execution of a release, to the revocation of a will, to a defence against the subtraction of titles. *Shotter vs. Friend,* (3 *Mod.* 283). *Breedon vs. Gill,* (1 *Ld. Raymond,* 221.)

And what reason can there be for the law's being content with one witness in these cases, which does equally exist for its being content with one in the case of the probate of a will.

There is, however, it must be admitted, in Godolphin's Orphan's Legacy this passage: "But regularly, a single witness, without other adminicular proof, is not sufficient to prove a will, as in the case of *Chadron against Harris,* where it is said that if the Ecclesiastical Court proceed in a manner that is mere spiritual and pertinent to their Court, according to the Civil Law, although their proceedings are against the rules of the Common Law, yet a prohibition does not lie. As if they refuse a single witness to prove a will, for the conusance of that belongs to them." The same thing is said by other elementary writers, and perhaps by some Judges in the course of a decision. (1 *Wms. Ex'rs, Pt. I. Bk. IV. ch.* 3, *sec,* 5. 18 *Vin. Ab. Prohibition,* (*Q.*) I doubt whether this position rests anywhere upon a better foundation than an *obiter dictum.* But of this I cannot be certain, as the case of *Chadron against Harris,* is reported in *Noy*—a report not within my reach.

Suppose it, however, to rest on a decided case, and so to be taken as law, how much does it amount to? this much: that the temporal Courts will not, in any case, step forward and pro-

hibit the spiritual Courts, in a proceeding for the probate of a will *before those Courts*, from requiring more witnesses than one to prove the will.    It does not amount to saying that the temporal Courts themselves, in a proceeding *before them*, involving the proof of a will, must, in every case, require the evidence of more witnesses than one to make out the proof of the will. And if it did, it would be contradicted by a great number of decided cases.

The result of those decided cases is, I think, well stated by *Greenleaf* in his work on Evidence, in the following words: "It is ordinarily held sufficient, in the Courts of Common Law, to call *one only of the subscribing witnesses*, if he can speak to all the circumstances of the attestation; and it is considered indispensable that he should be able, alone, to prove the perfect execution of the will, in order to dispense with the testimony of the other witnesses, if they are alive and within the jurisdiction.    But in Chancery, a distinction is taken, in principle, between a suit by a devisee, to establish the will against the heir, and a bill by the heirs at law, to set aside the will for fraud, and to have it delivered up.    For, in the former case, a decree in favor of the will is final and conclusive against the heir: but in the latter, after a decree against him, dismissing the bill, his remedies at law are still left open to him.    It is therefore held incumbent on the devisee, whenever he sues to establish the will against the heir, to produce all the subscribing witnesses, if they may be had, that the heir may have an opportunity of cross-examining them; but where the heir sues to set aside the will, this degree of strictness may, under circumstances, be dispensed with."    (2 *Greenl. Ev. sec.* 694, see cases cited there.    2 *Stark. Ev.* 922, 923, and cases cited.    1 *Phill. Ev.* 501.)

The rule in the temporal Courts, then, in proceedings *before them*, ordinarily is, that no more than one of the subscribing witnesses need be called, if that one is one who can speak to all the circumstances of the attestation.

Proceedings in the temporal Courts in which this rule has.

place, are proceedings which involve title to *land* claimed under a will, as an issue of *devisavit vel non*, or sometimes an action of ejectment. In such proceedings, the party claiming under the will has to prove the will—probate in the spiritual Courts being only sufficient to prove a will for goods, but not to prove one for lands.

It seems, then, that in England, in the spiritual Courts, as many as two witnesses are necessary to the proof of a will— such a will as those Courts can take cognizance of; that is, one of goods—and in the temporal Courts not more than one witness is commonly necessary to the proof of a will—such a will as those Courts can take cognizance of the proof of; that is, a will of lands.

This being the state of the English law, what is the state of our law?

By our law, the proceeding for probate, whether the will be one of goods or one of lands, or one of both, has to begin in the Court of Ordinary, though it may pass from that Court into higher Courts—the Superior and the Supreme. (3*d Art. Con.. Ga. Walker's Dig.* 415. *Prin. Dig.* 231.)

Suppose a proceeding before that Court—as there has been in this case for the probate of a will—a will partly of goods and partly of lands—which rule, as to the number of witnesses to be required, is the Court to follow, that of the English spiritual Courts, or that of the English temporal Courts—or is it to follow the rules of both? These are the precise questions now for determination.

The answer to these questions depends on the changes which this State has made in the English law. What, then, are those changes? They are, among others, the abolition, not only of the Ecclesiastical Courts, but of the whole Ecclesiastical establishment; the erection of the Court of Ordinary instead of those Courts; the erection of nothing instead of that establishment, and the adoption of "the Common Laws of England." The Court of Ordinary is a temporal Court, and is subject to the supervision of the Superior Court, and ultimately, to the supervision of this Court—both of which are also temporal

Courts—and Courts under the especial government of those "Common Laws of England" adopted by the State as aforesaid.

It seems to this Court a fair inference from all this, that the State intended the abrogation of all those usages and rules of the Ecclesiastical Courts, which were peculiar to those Courts, and which were opposed to the Common Law; and the substitution of the Common Law for those usages and rules—as for example: the abrogation of the usages and rules by which those Courts imposed penances, excommunications and other spiritual punishments—those by which they enforced the payment of tithes and other dues to the clergy—those by which they gave redress for the injuries of spoliation, dilapidation and neglect of repairing the church—those by which they required the depositions of witnesses to be taken down in writing—and those by which they required, for the proof of any fact, the evidence of not less than two witnesses.

This view is confirmed by the want of any attempt, on the part of the Courts of Ordinary or the Superior Courts, when supervising cases, brought up to them from the Court of Ordinary, to exercise or enforce any of those usages or rules. Those Courts, as far as we know, have never required depositions to be taken down in writing, or required the evidence of at least two witnesses to every fact or allegation in a case. In cases of marriage and divorce, which were, before the Revolution, cases of spiritual cognizance, the Superior Courts have never held that, be the circumstances what they may, the evidence of at least two witnesses was essential to the proof of every matter in the cases. On the contrary, these Courts, in practice, have contented themselves with the employment, as to this particular, of the rules of evidence prescribed by the Common Law.

And the view is also confirmed by the absurd, not to say bad consequences which would follow from the adoption of the opposite view—the view that the State did not intend for those spiritual usages and rules to give place to the rules of the Common Law. For in the case supposed, of a will of both lands and chattels seeking probate, if but one witness could be called

by reason, say of the death of the other two or more, the Court, governed by those usages and rules, would have to hold the will good as to the lands, but null as to the chattels. And is it to be presumed that the State ever intended a thing, to say the least, so absurd as that?

[1.] Upon the whole, the conclusion to which this Court comes is, that in the probate of wills, the Courts of Ordinary and the Superior Courts are to follow the rules of evidence prescribed by the Common Law and in use in the temporal Courts of England, at the time when Georgia first adopted the Common Law, unless Georgia has since repealed them; and not the rules of evidence then in use in the spiritual Courts of England; and therefore, we think that the Court erred in the charge to the Jury under consideration—a charge which, as we understand it, meant to tell the Jury, that unless the execution of the will was proved by the evidence of at least two witnesses, one speaking to the signing and publishing, and the other to that or to some adminicular circumstances, they could not find the execution of the will proved, whatever they might think of the other evidence in the case.

We do not mean to say, however, that we think the foundation laid for the introduction of secondary evidence of the hand-writing of Lee, one of the subscribing witnesses to the paper propounded as a will, was sufficient.

Nor do we mean to say, that we think less evidence is required, when the proceeding for probate is compelled by the heir, who is adverse to the will, than when the proceeding is the voluntary act of the executor, or a legatee who is friendly to the will.

Another portion of the part of the charge which the Counsel for the plaintiff argue not to be law, is the following: "That a person has not the right, and it is unlawful for him to move a testator to make him his executor or give his goods, when the testator is a person of weak judgment and easy to be persuaded, and the legacy great."

This, although it has the sanction of *Swinburne*, we cannot admit to be law. It has not the sanction of any other text

writer, or of any decision, as far as we know. It is contrary to what was said by LUMPKIN, J. in *Potts et al. vs. House*, (6 *Ga.* 359.) That is as follows: "With respect to a will alleged to have been obtained by undue influence, I would remark, that it is not unlawful for a person, by honest intercession and persuasion, to procure a will in favor of himself or another; neither is it, to induce the testator, by fair and flattering speeches; for though persuasion may be employed to induce the dispositions in a will, this does not amount to influence in the legal sense." "On this subject as on that, with regard to capacity, no precise and distinct line can be drawn. Suffice it to say, that the influence exercised must be an unlawful importunity, on account of the *manner* or *motive* of its exertion, and by reason of which the testator's mind was so embarrassed and restrained in its operation, that he was not master of his own opinions in respect to the disposition of his estate."

This language is very general. It says, that it is *not* "unlawful" for a person, "by honest intercession and persuasion, to procure a will in favor of himself or another." It makes no exception of the case, when the will is procured from a person of "weak judgment." And we think there is no such exception to be made. If the testator "moved" be a person of weak mind, and the legacy he gives great, the effect produced certainly ought, in general, to be a very *strong presumption* that the "moving" was undue—was "unlawful;" yet, the presumption ought not to be a conclusive one. For to make it conclusive might be to annul some very proper wills. Suppose that a father, of weak mind, is "moved" by his grown children to make a will, giving to them, in equal shares, all of his property, and appointing one of them the executor—their motive being, the fear that if their father died intestate, none of them could become his administrator, by reason of inability to give securities; and so, the fear that the administration of the estate would pass into the hands of strangers? Ought such a will to be annulled—annulled on the ground that it was simply "unlawful" for the children to "move" the father to make such a

will?    It ought, if the position of *Swinburne*, adopted by the
Court below, be right.    But we think it ought not.    Other
such cases may be supposed.

[2.] In our view then, the charge of the Court ought to be
slightly modified, to express the law on this point—modified as
follows : That though a person *has* a right, and it is *lawful* for
him to move a testator to make him his executor or give his
goods, even when the testator is a person of weak judgment
and easy to be persuaded, and the legacy great; yet, if, in
such case, a person does so move a testator, a very strong pre-
sumption arises that the moving is of a sort not right or law-
ful—a presumption only to be rebutted, as I think, by his bring-
ing forward something sufficient to show the will to be such as
a person of average mind, morals and family love might be
supposed willing to make.

We agree, then, with the Counsel for the plaintiff, that some
part of the charge of the Court did not fully express the law.
But we will not undertake to say whether the verdict was or
was not contrary to that part of the charge which did express
the law, nor whether it is true or not, that the verdict was con-
trary to law, as in another one of the grounds on which the grant-
ing of the new trial was put, it is assumed to have been; and
this we will not do for the same reason for which we forebore
to express an opinion as to whether the ground, that the ver-
dict was contrary to evidence, was or was not true.    To say
whether a verdict is contrary to law or not, it is, in general,
necessary to say whether it is contrary to evidence or not.
And this case is not an exception to that general rule.

[3.] The next of the grounds on which the granting of the
new trial was put, that we shall notice, was "the fact that
while the cause was pending before the Special Jury, E. E.
Crocker, Esq. one of the Counsel for respondent, on the night of
the twenty-third March, entertained at his house two of the
Special Jury to whom the said cause was submitted, and the
respondent, Charles Walker."    This is undoubtedly a good
ground.    It is hardly in the power of affidavits wholly to free
this affair from suspicion.    It is not in the power of affidavits

to show that the two Jurors were not consciously or unconsciously affected by it. In *Walker vs. Walker,* (11 *Ga. R.* 206,) this Court says: "when a Juror has been impannelled to try a cause, and during the trial and before he has rendered his verdict, he shall be *entertained* by either of the parties, at *their expense,* and the verdict be in favor of the party so entertaining the Juror, the verdict will be set aside." "This rule is indispensably necessary to preserve the purity and integrity of Jury trials in our Courts, and cannot be too strictly enforced."

This is not a case in which we can make a distinction between entertainment of a Juror by the prevailing party, himself, and entertainment by his Counsel.

The next and last of the grounds on which the new trial was granted was, "that the paper in the hand-writing of Lewis Solomon, and found by the Jury in their room, was calculated to mislead the Jury and influence their finding."

The Lewis Solomon referred to was the Ordinary, from whose judgment admitting the will to probate, the case on trial had, by appeal, been brought into the Superior Court. He was also the foreman of the Grand Jury, from which, after the removal of him from it for cause, had been struck the Special Jury trying the case. The paper was found by the Jury in their room, soon after they met in it to consider of their verdict.

Under these circumstances, we think the Court was sufficiently forbearing, when it said that the paper "was *calculated* to mislead the Jury and influence their finding."

The affidavit of Solomon amounts to this: that he did not intend the paper for the Jury, and that he does not know how it got before the Jury. The affidavit of the foreman of the Jury is, that the paper "was found in the room of the Special Jury;" "that said paper was found shortly after entering their room, before they made up their verdict, and was examined by all of the Jury, as this deponent remembers, before they deliberated on said cause and made up their verdict."

This affair has an ugly look. We think the Court was right

in making it a ground for a new trial. (*Coke Litt.* 227, *b*. 2 *Hale's P. C.* 308. *Metcalf vs. Dean, Cro. Eliz.* 189.)

So, these two grounds for a new trial being sufficient, the Court was right, as we think, in granting a new trial. But nothing whatever is meant to be said, as to whether or not the verdict was contrary to the evidence or to the weight of the evidence.