### STATHAM *et al. v.* THE STATE OF GEORGIA.

84 17
86 311
86 377

1. A juror who lodges as a paying boarder in the house of an attorney at law during court week, up to the call of a criminal case in which the attorney is counsel for the prosecution, is not, on that account alone, absolutely disqualified to serve as a juror in such case. If the relation of boarder be ground of challenge to the favor it should be presented and urged at the proper time.

v 84-2

2. A remark pending the trial, imputed to one of the jurors, to the effect that he would occupy but a short time in finding a verdict, denied on oath by the juror and proved only by the affidavit of another juror, is not cause for a new trial.
3. The evidence warranted the verdict as to the three persons found guilty.
4. The newly discovered evidence, going to no main fact, but to a single circumstance, and thereby tending to impeach one or more witnesses for the State, is not sufficiently material to call for a new trial.

December 2, 1889.

Criminal law. Riot. Jurors. Verdict. Evidence. Practice. Before Judge HUTCHINS. Jackson superior court. August term, 1888.

Memory Tucker, G. N. Arnold, Joseph Statham, Andrew Martin, Billy Robertson, Frank Robertson, James Archer and M. J. C. Statham were indicted for riot; it being charged that, on January 2, 1887, they assembled in a violent and tumultuous manner and went, about one o'clock at night, to the dwelling of W. O. Shellnut, broke down his door, dragged him from his bed, carried him (in his night clothes only) about 150 yards to a church, blindfolded him, tied his hands together, tied a rope around his neck, hung him twice until he became unconscious each time, dragged him about 40 yards into the woods, stripped him of his shirt and drawers, threw him across a log, and with a leathern strap twice doubled beat and wounded him until he was perfectly exhausted and helpless. Five of these, the two Stathams, Arnold, Martin and Billy Robertson, were put on trial. The two Stathams and Robertson were found guilty, with a recommendation to the clemency of the court; Arnold and Martin were found not guilty. Those convicted moved for a new trial on the grounds that the verdict was contrary to law and evidence, and was the result of a mere compromise; because of the facts as to the juror stated in

the first two divisions of the opinion ; and because of newly discovered testimony, hereafter stated.

On the trial, the testimony of the numerous witnesses introduced was generally conflicting as to most matters. That Shellnut was taken from his room at night and beaten was not denied; the main conflict was as to who were the persons who did this, as to the hour when it occurred, and as to its extent.  Shellnut testified that it was between eleven and twelve o'clock when they came; that he was aroused from sleep by their knocking the door down ; that they jerked him from the bed, not giving him time to get his clothes nor his wooden leg which he wore, carried him about 150 yards away, blindfolded him and tied his hands and legs, put a halter around his neck, drew him up in the church and asked him where Statham's money was; that they again drew him up, and when he became conscious again, they were dragging him over the ground and Billy Robertson was lashing him to a log; that after barbarously beating him with a wagon line doubled and twisted, they again asked him where the money was, and in order to save his life he told them that one Griffith got the money and gave him $5 to keep quiet, which was an untrue statement; that he recognized Tucker, Arnold, Martin, Joe Statham, Archer and the two Robertsons, and there were others; that they returned with him, between one and half past one o'clock, to the house of M. J. C. Statham, knocked at the door, asked for Mrs. Statham, and when she came, said, " Howdy, Grandmama," and then took him into the house and untied him ; that Statham had threatened, during the day, that there would be bad times for him (Shellnut), and he would have to bring in the money Mrs Statham claimed to have lost; that they had said their store had been robbed on the previous Tuesday night ; that later in the same night that the beating occurred, Statham sent for Memory Tucker,

and they took out a warrant against Shellnut for burglary, and on the next day but one carried him to jail, where he remained twenty-seven days; that during the night in question, John Dial, Jack Dial and Jim Spence came to Statham's house and there saw Shellnut; that while he was being carried out from his room to the church and woods, he struggled and cried as much as he could, and the fuss could have been heard for a half to three quarters of a mile, but they held his mouth so that he could not hollo; that the leather line they tied him with was frozen and had been used by Statham for a well-rope; that there was a light in Shellnut's house when they came, and he recognized them when they took hold of him; that there was no moon, but the stars gave a good light; that they had their faces smutted, having put smut on their hands and rubbed them on their faces; that Tucker had an old sack wrapped round his waist, not a disguise, and they had on overcoats, except Frank Robertson, and another had on blankets; that Joe Statham, Martin and Bill Robertson left the log before Shellnut was carried from there to the house, and when, on arrival there, they turned him loose, Joe Statham caught him; that they had tried to wash the black off; that it was after three o'clock when Tucker came, and he had just begun to write when the Dials came; that Shellnut did not tell them then who had done the beating, as he did not want to do so before M. J. C. Statham, who was not in it; that they never blindfolded him till they reached the church, and he got it slipped from over his left eye and could see when part of the crowd left; that Shellnut has a civil suit for $10,000 damages against these parties, etc.

J. W. Spence, Jonathan Dial, John Dial, David Dial and four other witnesses were introduced by the State, Their testimony tended to show that, about midnight. Shellnut's wife, Jack Dial and one Furguson went to

Spence's house, about three quarters of a mile from that of Shellnut, and all of them went to Statham's and found Statham, his wife, Joe Statham, Martin and Shellnut; that Shellnut was lying on a lounge and said he was beaten nearly to death; that Statham said he was not hurt much, but they had whipped him a little; that Jonathan Dial heard blows and one long groan as he went to his home, about half a mile from Statham's, and saw Joe Statham, early the next morning, smutty around the eyes, and he said to Dial, in answer to the question if they had hurt Shellnut much, "Not much, and pretty bad too." John Dial also testified to seeing this smut, and that it was near to three o'clock in the morning. David Dial swore that he was at Frank Robertson's house on the night in question, and between seven and eight o'clock Frank and Bill Robertson went off together, the former saying he was going to Statham's for a sack of flour; and that he returned between two and three o'clock, not bringing any flour and not saying where he had been. Furguson testified that he was at Bill Roberston's and Bill was not there at bedtime, and witness saw him there dressed about an hour before day. Shellnut was corroborated, in part, as to what occurred on his being taken away from his room, by his mother-in-law. When his wife went to Dial's, she said they had taken her husband out to kill him. Spence testified that Shellnut's general character was "rough," and would not swear he would believe him on oath; and Furguson testified that his general character was bad. Three other witnesses for the State testified that his general character was good, and that they would believe him on oath.

The testimony for the defence was to the effect that, when Shellnut was brought back, the crowd first went to the house where he lived (which was in M. J. C. Statham's yard) and called for his wife and mother,

and finding that they had gone, called for M. J. C. Statham and said he must take care of Shellnut; that he took Shellnut in, treated him well, called for Joe and Andrew Martin and made them get his clothes and put them on him; that the men who brought him were all disguised, having on dough-faces and coats turned wrong side out, and could not be distinguished; that Shellnut told Spence that Griffith stole the money and gave him five dollars to keep the secret, and wanted to swear out a warrant for Griffith; that M. J. C. Statham heard a lumbering about the time he supposed the crowd first came, and asked Joe about the horses, and Joe replied that they were all right, and M. J. C. lay down again, and in half an hour they came with Shellnut; that M. J. C. Statham then spoke to Joe and Andrew Martin, who were there sound asleep; that Bill Robertson went to his brother Frank's after supper that night, staid till eight o'clock and then went to one Flanigan's and staid till nearly day, and did not see Tucker, Martin, M. J. C. Statham nor Joe Statham that night; that Frank was at home when he got there, and went back into the house after going with Bill to the gate as he left, and Bill saw him no more that night; that he met Frank and Jim Archer and one Morrow, a bailiff, the next morning, and they induced him to go with them to arrest Griffith, which was done; that Frank Robertson moved away afterwards, and the witnesses did not know where he was; that Martin and Joe Statham saw no black on each other's face; that when Martin was waked, he saw six or eight people through the window, but heard no crying or groaning; that the men were unknown to him or to Joe or M. J. C. or Mrs. Statham; that Martin was staying at Statham's that night, got there about eight o'clock, and was asleep, as was Joe also, when M. J. C. Statham asked him about the horses; that Shellnut's character

was bad, and the witnesses would not believe him on oath, etc. There was some testimony as to certain statements of Shellnut in conversations, inconsistent in some measure with his testimony.

The newly discovered testimony was by J. D. Morrow, his wife and J. A. Archer, and was to the effect that Joe Statham went to Morrow's house on the night in question between eleven and twelve o'clock for the purpose of getting the warrant for Griffith executed, and was seen distinctly in good light by Morrow and wife, and by Archer, and had no smut or black about his eyes, cheeks, ears or neck; with affidavits of defendants, their counsel and others, relative thereto.

Defendants excepted to the refusal of a new trial.

J. B. Estes and W. I. Pike, for plaintiff in error.

R. B. Russell, solicitor-general, J. A. B. Mahaffey and J. B. Silman, for the State.

Bleckley, Chief Justice.

1. Two complaints are made of the juror Barr. First, that he lodged with Mahaffey, one of the counsel for the State, as an inmate of his house, from the commencement of the term up to the time he was selected and sworn as a juror for the trial of this particular case. It appeared, however, that he was a boarder in Mahaffey's house, paid board, knew nothing of Mahaffey's relation to the case until the trial opened, and had not heard anything said touching the same, either by Mahaffey or any one else in the house. His business relation with Mahaffey as a mere boarder tended in no way to disqualify him for the functions of an impartial juror. He paid for his board, and therefore was no recipient of any favor, as were the jurors in *Walker* v. *Walker*, 11 *Ga.* 203; *Walker* v. *Hunter*, 17 *Ga.* 364; and *Springer* v. *State*, 34 *Ga.* 379. Moreover, this relation of landlord and boarder was not continued after

the trial commenced, nor does it appear that its previous existence was unknown to the accused parties and their counsel. If they knew of it, and if it was cause of challenge to the favor, they should have taken advantage of it as such before the juror was accepted and sworn.

2. The second ground of complaint is that this same juror said in the presence of his fellow-jurors, while the trial was in progress and before the argument was concluded, that it would not require more than twenty minutes for him to find a verdict after going out. He denied by affidavit that he made any such remark, and there is no proof that he did make it except by the affidavit of one of the jurors, and he was incompetent to establish the fact, if so doing would go to impeach the verdict. But aside from this, the two affidavits would set off each other, to say nothing of that made by a third juror, who testified that he heard no such remark. Furthermore, as the observation, even if made, did not indicate which way the juror was ready to find, it was hardly calculated to influence the minds of the other jurors unduly, and would not, as we think, be such misconduct as to lay the foundation for a new trial.

3. Touching the merits of the case, we need say only that we have examined the evidence carefully, and consider it quite sufficient to warrant the verdict as to all three of the accused found guilty. Relatively to one of them, M. J. C. Statham, the inculpatory evidence was wholly circumstantial, but the circumstances were very forcible. They showed a motive on his part to instigate the outrage which was committed on the prosecutor, and that he was neither surprised at it, nor, so far as appears, had curiosity enough to inquire why it was committed. When the prosecutor was brought to his house late at night, he received him in a sort of matter of course way, and proceeded at once to act upon the

information which the rioters by their abuse had extorted from him, and upon that information sued out warrants immediately. We think the jury could well conclude that he was at the bottom of the whole business, and that, although not immediately present at the hanging and whipping of the prosecutor, he was their accomplice in their merciless and outrageous midnight rioting. If he was, his absence from the scene of the offence would not prevent him from being a principal in the misdemeanor. *Kinnebrew* v. *State*, 80 *Ga*. 232.

4. The newly discovered evidence does not go directly to any main fact, but only tends to impeach some of the State's witnesses as to a particular circumstance. We think it is not sufficiently material to call a new trial.                 *Judgment affirmed.*